UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION

In re:

BSML, INC., d/b/a BRITE SMILE,                    Case No.: 10-19119-PGH

      Alleged Debtor.                                    Chapter 7

_____/

### PETITIONING CREDITORS' EMERGENCY
### MOTION FOR APPOINTMENT OF INTERIM TRUSTEE

** Emergency Hearing Requested Pursuant to Local Rule 9075-1 **

**Basis for Emergency Relief**

The Petitioning Creditors believe that the Alleged Debtor's assets will be significantly dissipated during the intervening gap period; therefore, emergency relief is requested. The Petitioning Creditors have not been able to make a bona fide effort to resolve this motion without a hearing, even though the Alleged Debtor has been served the involuntary petition, since the Alleged Debtor has not entered an appearance in this case.

Petitioning Creditors, Kenneth J. Gary, Nina Kalinski, Merline Sainvil, Karen Norris, Katie Rose, ASC Group, Edyta Rogalska, Herbert Kollinger and Anahita Ghalander (the "**Petitioning Creditors**"), by and through undersigned counsel and pursuant to 11 U.S.C. § 303(g), file their *Emergency Motion for Appointment of an Interim Trustee*, and in support thereof, respectfully states as follows:

    1.    On April 8, 2010, the Petitioning Creditors filed an Involuntary Bankruptcy Petition under Chapter 7 of the Bankruptcy Code against BSML, Inc. d/b/a Brite Smile (the "**Alleged Debtor**").

    2.    The Petitioning Creditors are collectively owed at least $54,283 for wages and trade payables.

{1349/000/00034392 }                              1

3.     To date, an order for relief has not been entered.

4.     According to its website, the Alleged Debtor is in the business of offering professional teeth whitening, cosmetic dental procedures, med spa services and whitening retail products and operates its business at approximately forty-one (41) locations throughout the United States and Canada. *See* http://www.britesmile.com/about/locations.php.

5.     Upon information and belief, several of the Alleged Debtor's business locations have been closed over the past few weeks.

6.     While the Alleged Debtor is generally not paying its debts as they come due, the Petitioning Creditors are concerned that the corporate assets of the Alleged Debtor are presently being depleted.

7.     According to the testimony of the Alleged Debtor's Vice President, James Cullin, at his 2004 examination taken on April 14, 2010, he admitted that he has actual knowledge that the corporate assets of the Alleged Debtor are presently being depleted. *See* Cullin Depo. p. 32 ¶ 8 attached hereto as **Exhibit "A"**.

8.     Specifically, James Cullin testified that the Alleged Debtor's CEO, Jeffrey Nourse collected a $350,000.00 account receivable of the Alleged Debtor and then "within a few days of receiving that [account receivable, he] advanced back to [the Alleged Debtor] $300,000.00, and . . . wanted [the Alleged Debtor] to draw him up a note payable for the $300,000.00 that he advanced [to the Alleged Debtor], [e]ven though it was already [the Alleged Debtor's money]." Cullin Depo. pp. 32–33. Therefore, James Cullin admitted that $65,000.00 is unaccounted for. *Id.*

9.     Additionally, James Cullin testified that Ultimate Dental currently operates ten to twelve of the Alleged Debtor's business operations but none of the revenues from those stores

are being deposited into the Alleged Debtor's bank accounts and the Alleged Debtor never received anything from Ultimate Dental to take over the operation of those stores. Cullin Depo. p. 36–38.

10.     Furthermore, James Cullin testified that he believes that Jeffery Nourse, "is using the license of the company [and] the current operations, for his capital contribution into a new company . . . ." Cullin Depo. p. 37 ¶ 17–20.

11.     In order to preserve the assets of a bankruptcy estate, 11 U.S.C. § 303(g) provides for the appointment of an interim Chapter 7 trustee during the gap period prior to the entry of an order for relief. 11 U.S.C. § 303(g); *In re R.S. Grist, Co.*, 16 B.R. 872, 873 (S.D. Fla. 1982).

12.     For the reasons set forth by the Alleged Debtor's Vice President's testimony, the Petitioning Creditors contend that it is necessary for an interim Trustee to be appointed to preserve the property of this estate; therefore, the Petitioning Creditors respectfully request that the Court direct the United States Trustee's Office to immediately appoint an interim trustee under 11 U.S.C. § 701 to take possession of the property of this estate to prevent further diminution of the Alleged Debtor's corporate assets.

**WHEREFORE**, the Petitioning Creditors, Kenneth J. Gary, Nina Kalinski, Merline Sainvil, Karen Norris, Katie Rose, ASC Group, Edyta Rogalska, Herbert Kollinger and Anahita Ghalander respectfully request the entry of an order directing the United States Trustee's Office to immediately appoint an interim trustee under 11 U.S.C. §§ 105, 303(g) and 701 to take possession of the property of this estate, including but not limited to the Alleged Debtor's bank accounts, and to grant such further relief as the Court deems just and proper.

Respectfully submitted,

Bradley S. Shraiberg, Esq.
**SHRAIBERG, FERRARA & LANDAU, P.A.**
Counsel for the Petitioning Creditors
2385 NW Executive Center Drive, #300
Boca Raton, Florida 33431
Telephone: 561-443-0800
Facsimile: 561-998-0047
Email: bshraiberg@sfl-pa.com

By: /s/ Bradley S. Shraiberg
    Bradley S. Shraiberg
    Fla. Bar No. 121622
    Lenore M. Rosetto
    Fla. Bar No. 064448

## ATTORNEY CERTIFICATION

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of this foregoing was furnished via U.S. Mail and email or Notice of Electronic Filing this 21st day of April, 2010 to all parties on the attached Service List.

    /s/ Bradley S. Shraiberg
    Bradley S. Shraiberg

## SERVICE LIST

### 10-19119-PGH

**Via CM/ECF:**

Office of the US Trustee
USTPRegion21.MM.ECF@usdoj.gov

Bradley S Shraiberg on behalf of Petitioning Creditor Alan Adcock
bshraiberg@sfl-pa.com, lmelton@sfl-pa.com;lrosetto@sfl-pa.com;blee@sfl-pa.com

**Via U.S. Mail:**

BSML, Inc.
7777 Glades Road
Suite 100-K8
Boca Raton, FL 33434

BSML, Inc.
7777 Glades Road
Suite 202
Boca Raton, FL 33434

# EXHIBIT A

Page 1

```
 1   UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF FLORIDA
 2   WEST PALM BEACH DIVISION
 3
 4           Case No. 10-19119-BKC-PGH
 5
 6   In re:
 7   BSML, Inc., d/b/a BRITE SMILE,
 8      Alleged Debtor.
                                      /
 9
10
11
12
13
14       SHRAIBERG, FERRARA & LANDAU, P.A.
         2385 NW Executive Center Drive, Suite 300
15           Boca Raton, Florida 33431
             Wednesday, April 14, 2010
16           3:40 p.m. to 4:45 p.m.
17
18
19
             2004 EXAMINATION
20
                  OF
21
             JAMES CULLIN
22
         taken pursuant to notice
23       on behalf of Petitioning Creditors.
24           - - - - -
25
```

Page 2

```
 1          APPEARANCES:
 2
 3   SHRAIBERG, FERRARA & LANDAU, P.A., by
        JAMES FERRARA, ESQUIRE and
 4      BRADLEY S. SCHRAIBERG, ESQUIRE
        On behalf of the Petitioning Creditors.
 5
 6
 7           - - - - -
 8
 9
             I N D E X
10
11   WITNESS              DIRECT    CROSS
12   JAMES CULLIN
        By Mr. Ferrara       3
13
14
         EXHIBITS MARKED FOR IDENTIFICATION
15
     Number              Page
16    1, Draft balance sheet      10
      2, Accounts payable listing 11
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   Thereupon:
 2           JAMES CULLIN,
 3   after first being duly sworn, was examined and
 4   testified under oath as follows:
 5           DIRECT EXAMINATION
 6       MR. SHRAIBERG: Thank you for coming.
 7       First, why don't you please introduce
 8   yourself.
 9       THE WITNESS: My name is James Cullin.
10       MR. FERRARA: C-U-L-L-E-N?
11       THE WITNESS: C-U-L-L-I-N. I am currently
12   the vice president of finance in BSML, Inc. I do know
13   everything about the day-to-day financing -- or at
14   least up through the last few months, everything
15   always went through our office, so I don't know if
16   there's another operation going on out there or not.
17   I don't believe there is, but there very well could
18   be.
19   BY MR. FERRARA:
20       Q  Is your business address or where you report
21   to work every day the commonplace of business for --
22       A  It was the accounting --
23       Q  -- BSML?
24       A  -- headquarters. It was the accounting and
25   administrative headquarters. We have 40 stores
```

Page 4

```
 1   throughout the country, and this was always the
 2   accounting and administrative headquarters.
 3       Q  Is that the one on Glades Road in Boca Raton?
 4       A  Yes.
 5       Q  Where would you find, for instance, the CEO,
 6   where is his desk?
 7       A  The CEO, while there is an office in our
 8   building for him, but he's very rarely in Boca. He
 9   resides in Toronto and travels to the locations. He
10   mainly works out of the -- he never comes to the
11   office or is very rarely in the office.
12       MR. SHRAIBERG: What's his name?
13       THE WITNESS: His name is Jeffrey Nourse.
14       MR. SHRAIBERG: Can you spell that, please?
15       THE WITNESS: N-O-U-R-S-E.
16       MR. FERRARA: Right.
17       MR. SHRAIBERG: Let me just slow down for one
18   second and introduce ourselves. I'm not going to be
19   staying in for he whole time, but I am Brad Shraiberg.
20   I know that we have spoken on the phone before today.
21   I am one of the attorneys for the petitioning
22   creditors. Jim, to my right, is my partner, and he's
23   also working on the case. His name is Jim Ferrara.
24   We're here today to ask you a number of questions on
25   the record about Brite Smile, which is the alleged
```

1 (Pages 1 to 4)

Page 5

1  debtor in this involuntary bankruptcy case.
2      As you saw today, you are under oath, and
3  everything that's being said is being taken down by
4  the court reporter, so it's very important that when
5  we ask you questions today, to have a clear record
6  today, that you answer our questions audibly instead
7  of a nod of the head --
8      THE WITNESS: Mm-hmm.
9      MR. SHRAIBERG: -- and we ask if possible if
10 you can answer a yes or no question with a yes or a
11 no, because uh-huhs easily look like huh-uhs in a
12 transcript.
13     If at any time you do not understand the
14 question that either Jim or myself asks, please say,
15 "I don't really understand the question." If you
16 answer it, it's assumed that you did understand what
17 the question was, and if at any time during this
18 examination, you need a break, you want to grab a
19 drink or just to stand up, just let us know and we
20 will freely allow that. This is not going to be a --
21 or shouldn't be a long examination. We're just
22 looking for some preliminary information during what
23 is called this gap period in this involuntary
24 bankruptcy, and with that, I guess I will turn it back
25 over to Jim.

Page 6

1      THE WITNESS: Okay.
2      MR. FERRARA: Well, thanks, Mr. Cullin for
3  coming in.
4  BY MR. FERRARA:
5   Q  Throughout today's examination, I'm going to
6  refer to BSML, Inc. as Brite Smile, so we're on the
7  same page?
8   A  Yes.
9   Q  Is that okay?
10  A  That's fine.
11  Q  And you gave us your name as James Cullin,
12 and tell me your office address if you would?
13  A  I'm at 7777, four of them --
14  Q  Got it.
15  A  -- Glades Road, Suite 100.
16  Q  Boca Raton?
17  A  Boca Raton, Florida.
18  Q  And just in case that office closes, could
19 you please give me your home address and contact
20 information.
21  A  My home address is 10501 Northwest 7th
22 Street, Plantation, and that's 33324.
23  Q  And how long have you been at the Northwest
24 7th Street address?
25  A  Twenty-five years.

Page 7

1   Q  Any plans on moving from there?
2   A  No.
3   Q  Very good.
4      All right. You're employed, am I correct, by
5  Brite Smile?
6   A  Yes.
7   Q  And what is your position with the company?
8   A  I'm the vice president of finance.
9   Q  And before I start talking about what your
10 duties are, just give me a very basic understanding of
11 your educational background. We can start with
12 university or college.
13  A  I have a degree from Barry University. I'm a
14 certified public accountant in the State of Maryland.
15 I've been doing accounting for the last 35 years.
16  Q  Very good. Thank you.
17     How long have you been employed by Brite
18 Smile in any capacity?
19  A  Approximately a little over a year.
20  Q  And were you hired as the vice president of
21 finance?
22  A  Yes.
23  Q  And so you've remained in that position until
24 today?
25  A  Yes.

Page 8

1   Q  Has there ever been any change in your
2  position?
3   A  Well, I was -- no. I was hired as vice
4  president of finance the whole time.
5   Q  And can you tell me what your duties as vice
6  president of finance are?
7   A  I prepare the SEC filings and run the
8  accounting department and administration portion of
9  Brite Smile.
10  Q  The accounting portion, I can understand.
11     Tell me what it entails when you say the
12 "administration" portion.
13  A  The HR, people and the payroll.
14  Q  Would you say you're the most senior person
15 in the Boca Raton office of Brite Smile.
16  A  In -- yes, in Boca Raton I am.
17  Q  And just so I'm familiar with the rest of the
18 company, we've discussed your position, are there any
19 other vice presidents?
20  A  There are -- currently there aren't any other
21 vice presidents, but there's the chief executive
22 officer, Jeff Nourse --
23  Q  Jeff Nourse, okay.
24  A  -- and chief operating officer, who is Louise
25 Talbot.

Page 9

1  Q  And you've told us before, and I think we
2  were on the record at the time, that Mr. Nourse
3  resides in Toronto, rarely comes to Boca Raton --
4  A  Mm-hmm.
5  Q  -- and spends most of his time going from
6  locations around the country?
7  A  Yeah, and Louise, I guess, is officially a
8  resident of Texas, but, again, she travels almost a
9  hundred percent --
10  Q  All right.  And --
11  A  -- to the operations.
12  Q  And what was her last name?
13  A  Talbot.
14  Q  T-A-L-B-O-T?
15  A  Yes.
16  Q  So Mr. Nourse and Ms. Talbot are, what you
17  say, the two officers or directors that are senior to
18  you?
19  A  Yes.
20  Q  Is there anybody else that's senior to you?
21  A  No.
22  Q  All right.  You received a subpoena from our
23  office, correct --
24  A  Yes.
25  Q  -- for today's examination?

Page 10

1      And part of the subpoena asked you to bring
2  with you certain documents, correct?
3  A  Yes.
4  Q  What I would like to do is, first of all, go
5  through each of the things that you brought with you,
6  and then over the course of your examination, we can
7  go into them a little bit more in depth.
8  A  Mm-hmm.
9  Q  What is the -- let's talk about this one
10  first.
11  A  Okay.  This is a draft balance sheet.
12      MR. FERRARA:  Let me go ahead and have -- I
13  will just put it on the back and we can do the
14  signatures later.  We're going to mark this as Exhibit
15  No. 1.
16      (Thereupon, the document referred to was
17  marked as Exhibit No. 1 for identification.)
18  BY MR. FERRARA:
19  Q  And tell me exactly what Exhibit No. 1 is?
20  A  Exhibit No. 1 is a draft balance sheet of
21  BSML, Inc. as of December 31, 2009.
22  Q  And who created that document?
23  A  I created this document.
24  Q  When did you create it?
25  A  I created this about a month ago, month and a

Page 11

1  half ago.
2  Q  Have there been any other draft balance
3  sheets that you've produced since that time?
4  A  No.
5  Q  Okay.
6  A  This is the latest I have.
7  Q  And is it inclusive of all assets,
8  liabilities, equities, shareholder equities, as of
9  December 31, 2009?
10  A  Yes.
11  Q  All right.  Stick that aside for a second.
12      Tell me what else you have there, Mr. Cullin.
13  A  This -- I wasn't sure -- this is an accounts
14  payable listing, but it's as of 6/29/09.
15  Q  All right.
16  A  The only reason I only have the 6/29 is I
17  don't have access to my accounting system right now.
18  Q  All right.  We will get into that in a
19  second.
20      So everything I have in front of me is all
21  part of one document, and it's multiple pages,
22  correct?
23  A  Yes.
24      MR. FERRARA:  All right.  So I'm going to
25  mark this on the very last page, No. 2.

Page 12

1      (Thereupon, the document referred to was
2  marked as Exhibit No. 2 for identification.)
3  BY MR. FERRARA:
4  Q  And according to your testimony, this is an
5  accounts payable as of the end of June 2009?
6  A  Yes.
7  Q  All right.  The -- well, before I forget, you
8  indicated it's dated as of June 2009, because you do
9  not have access to your accounting software.
10  A  Yes.
11  Q  What's preventing you from accessing the
12  accounting software?
13  A  We had nonpayment of the bill, and the vendor
14  cut off our service.
15  Q  So you're not current on your accounting
16  software?
17  A  Right, or my e-mails or my POS system.
18  Q  What's the name of the company that provides
19  you with accounting software?
20  A  It's a company called Champs, is the -- they
21  administer the system.  It's a canned system that they
22  have.  It's Mass 90.
23  Q  What do you mean by that phrase?
24  A  Mass 90 is just the name of an accounting
25  software --

3 (Pages 9 to 12)

Page 13

1    Q  Okay. Mass 90.
2    A  -- package. Champs runs a computer
3  networking for them, where that program and data is on
4  their system.
5    Q  How long has it been since you've been unable
6  to access your accounting software through that
7  company?
8    A  Probably about a month now.
9    Q  All right. Let me go through other things
10  that were requested and tell me if you have them, and
11  if you don't have them, why you were unable to bring
12  them, okay?
13    A  (Witness nods his head.)
14    Q  We have the current balance sheet -- well,
15  when we say "current," it's as of December 31, 2009?
16    A  Mm-hmm.
17    Q  Number 2 was a general ledger from April 12,
18  2009 until April 12, 2010.
19    A  Again, that's part of the accounting
20  software.
21    Q  Okay. Number 3 was a list of all creditors
22  and their addresses.
23       I see what you brought, and that's No. 2, and
24  that's as current as you could access.
25    A  Yes, and, again, this is all on the

Page 14

1  accounting software.
2    Q  Number 4, I imagine it's going to be the same
3  answer, but --
4    A  Yes.
5    Q  -- I have to ask the question, a current
6  payables aging?
7    A  Same thing.
8    Q  Unable to access it?
9    A  Yes. If I had the machine, I could just
10  press the button and it prints out.
11    Q  And the fifth one is a little broad, and it
12  says, "Any documents evidencing the current financial
13  condition of the alleged debtor," which is Brite
14  Smile.
15    A  I didn't -- wasn't quite sure what that --
16    Q  Would you say that the balance sheet --
17    A  Yeah, the balance --
18    Q  -- is a pretty good indicator?
19    A  Yeah, the balance sheet covers it fairly
20  well, that it shows, you know, we have a deficit in --
21  or our equity is a negative $6 million.
22    Q  Well, let's do this, you were kind enough to
23  bring me this draft balance sheet as of -- it's
24  current as of December 31, 2009.
25       Can you go through the numbers that are

Page 15

1  outlined in that draft balance sheet?
2    A  Mm-hmm.
3    Q  Go ahead.
4    A  Sure. Cash is $61,000, which is just current
5  bank balances as of December 31st. Accounts
6  receivable are the accounts receivable of the company
7  at that time, I'm going by memory now, is QVC was
8  about 230,000 Destiny Marketing was $400,000, Group On
9  was 230,000. Safora (phonetic) was about 50 or
10  60,000, and BSML, Inc. of Canada was about a hundred
11  thousand.
12    Q  And those are the entities that owe --
13    A  Owe --
14    Q  -- BSML money?
15    A  Yes, money.
16    Q  And I understand you don't have access to the
17  accounting software.
18       Do you have any indicators as to how accurate
19  these figures are today, April 14, 2010, or is it just
20  impossible to know?
21    A  Well, without the account -- because in the
22  accounting system we can show that most of them have
23  either been paid or there's been some other
24  resolution. I know that the open items today still
25  are Group On still has a $341,000 balance. Destiny

Page 16

1  has returned the pens, but we're trying to track down
2  exactly where those pens have been returned to.
3    Q  And the pens you mean are what people use to
4  whiten their teeth?
5    A  To whiten their teeth, and also that's the
6  $400,000 receivable. We had sold that to them, and
7  they were going to resell them. Group On still owes
8  us that. Canada still owes a hundred thousand
9  dollars.
10    Q  Can you give me a rough estimate as to what
11  the assets of the company are as of April 14, 2010?
12    A  Right now Group On's receivable for
13  approximately $350,000, a hundred thousand dollar
14  receivable from BSML Canada.
15    Q  How about cash?
16    A  Cash, there's zero cash.
17    Q  How about bank accounts?
18    A  Well --
19    Q  Same?
20    A  That includes that, that's all.
21    Q  How about inventory?
22    A  Inventory, there's probably three or $400,000
23  at QVC, three or $400,000 or Oralceutical, which is
24  our manufacturer.
25    Q  How do you say it, Ora --

4 (Pages 13 to 16)

Page 17

1  A  Oralceutical, O-R-A-L-C-E-U-T-I-C-A-L, I
2  believe. Spelling is not my --
3  Q  Any other significant inventory?
4  A  No, that's probably it for the inventory.
5  Q  And prepaid expenses?
6  A  There's virtually nothing. They have no real
7  tangible value at this point. Most of those are just
8  things that we would amortize out.
9  Q  The --
10 A  There's one other assets that really isn't
11 listed on the balance sheet.
12 Q  And what's that?
13 A  Which is the license to use the Brite Smile
14 name in retail --
15 Q  And that's from --
16 A  -- in operations.
17 Q  That's from the California company that you
18 license that from?
19 A  Well, it was originally Brite Smiles.
20 Q  Right.
21 A  Brite Smiles sold most of those assets to
22 Discus Dental, but at the same time, they granted
23 themselves back a license to operate the spas and sell
24 on a retail market. Discus Dental got the rights to
25 sell to dentist offices.

Page 18

1  Q  Dental offices.
2  A  And, in essence, Brite Smile kept the right
3  to go to QVC or CVS, and -- so right now we have
4  operations with QVC and Safora, to use -- to sell
5  through those outlets.
6  Q  Has there been any valuation of that license?
7  A  There's no real valuation been done on it.
8  Q  All right. Let's talk about the liabilities
9  and the equity.
10    It indicates as of December 31, 2009 that
11 accounts payable is in excess of $7 million?
12 A  And currently I would expect it to be a
13 little over $8 million.
14 Q  All right. And the next line is --
15 A  Accrued expenses, accrued liabilities.
16 Q  Accrued liabilities. That number there is
17 approximately 2,148,000.
18    What would you estimate that it is today?
19 A  It's probably around $3 million, because
20 there's approximately $900,000 in accrued wages that
21 are owed to employees.
22 Q  What is the next line?
23 A  The next line is the current portion of the
24 Medisis (phonetic) note.
25 Q  Give me a little bit better information on

Page 19

1  that?
2  A  We have a loan from Medisis, which is a
3  company out of Arizona. They lent us $2.5 million
4  back on April 1, 2009, and that just represents the
5  current portion that we would owe them back.
6  Q  The $824,000?
7  A  Yes.
8  Q  Has it increased since December 31st?
9  A  No, because that is what you would owe over
10 the next year.
11 Q  Is Brite Smile current --
12 A  We were in default of that.
13 Q  You are in default?
14 A  Yes.
15 Q  Is that in litigation?
16 A  It's not in litigation. We just received the
17 default letters, but, yeah, they have not foreclosed
18 or done anything on that.
19 Q  And what is the last line there?
20 A  Then the last line is a company called
21 Inficat (phonetic). They are a credit card advance
22 company. In October they gave us $500,000, and we
23 promised to pay them back 600,000 through -- they
24 would take ten percent -- or nine percent of our
25 credit card receipts to take their debt out, and

Page 20

1  that's the remaining portion to Inficat.
2  Q  Okay. The 333,000?
3  A  Yeah. That's approximately 270,000 now.
4  Q  And let's talk about the long-term
5  liabilities.
6  A  Long-term liabilities is a million-six, is
7  deferred revenue. We do a business where someone
8  would come in and, say, pay us a thousand dollars.
9  They would receive six different treatments, either
10 laser hair removal, Botox injections, and they would
11 receive this over a period of time. This represents
12 the portion of that thousand where we collect the
13 money and we have not performed the services.
14 Q  Okay. So it's almost like a prepaid --
15 A  Yes.
16 Q  -- package that a consumer would purchase?
17 A  Right, so this represents what I owe
18 consumers.
19 Q  If you were unable to now provide further
20 services, you anticipate that you would owe
21 approximately $1.6 million of unprovided services?
22 A  Yes.
23 Q  All right.
24 A  And right now I'm getting a large amount of
25 chargebacks --

5 (Pages 17 to 20)

**Page 21**

1  Q  From the credit cards.
2  A  -- from the credit cards, and the credit card
3  company is not very happy with us at this point.
4  Q  Understood.
5     What is the deferred revenue -- we just
6  talked about that, correct?
7  A  Yes.
8  Q  What's the next one, other long-term
9  liability, approximately 138,000?
10  A  That's from rent escalations. For accounting
11  purposes, you take the amount that you owe as a lease
12  over the life of the lease and straight line it, you
13  just take the average, so if your lease goes up two
14  percent every year, for accounting purposes you take
15  the amounts owed for each one of the years, add them
16  up, divide them by the period that it represents, and
17  you charge the books every month for the same amount.
18  This represents that incremental piece. Now, it's an
19  accounting technique that's -- you know, it just shows
20  that we will have --
21  Q  You'll increase the liability of the certain
22  spaces?
23  A  We will pay more in rent -- or we would pay
24  more in rents than it would show on the rent line of
25  the expense.

**Page 22**

1  Q  All right. You have indicated subordinated
2  debt of approximately $3.3 million.
3     Can you explain what that line means?
4  A  Okay. That subordinated debt is the $2.5
5  million for Medisis, which a portion is up here.
6  Q  Right.
7  A  There's also $625,000, which is part of my
8  other assets, which is a commitment fee over the four
9  years we would pay that off. There is a note to Bill
10  Corner and Ken Gary for $500,000.
11  Q  Are either of those notes in default?
12  A  Yes.
13  Q  Okay.
14  A  There's a $500,000 note to Genuity
15  (phonetic), which is a prior owner. That's the
16  million -- I'm just trying to make sure I have all my
17  notes.
18  Q  Are there any other notes that we haven't
19  discussed?
20  A  Well, those two, to Ken Gary and Genuity, and
21  that's it.
22  Q  And just those two notes total a million
23  dollars?
24  A  Yes.
25  Q  So as of December 31, 2009, the total assets

**Page 23**

1  were approximately $9.2 million and the total
2  liabilities exceeded assets in the -- and that was --
3  I'm sorry. Go ahead?
4  A  Yeah, they exceed assets by $6.2 million.
5  Q  All right. Moving on to the second exhibit,
6  these are a long list of creditors of BSML, Inc.,
7  correct?
8  A  Yes.
9  Q  Would you agree with me that the number of
10  creditors exceeds 11?
11  A  Yes.
12  Q  Okay, very good.
13     And I know that this is about nine months
14  old.
15  A  Mm-hmm.
16  Q  Does the list of these creditors get larger,
17  or are there some creditors on here that you believe
18  should no longer be on this list?
19  A  They would probably get a little longer.
20  Some would have come on, some would have come off.
21  Q  Come off, but the number that we see here is
22  an approximate?
23  A  Yes, it would be larger.
24  Q  Okay. I'm just going to go through quickly
25  some of the petitioning creditors, ask you if you're

**Page 24**

1  familiar with them. I'm going to suggest to you the
2  amount that they claim they are owed and see if you
3  dispute that amount, okay?
4  A  Mm-hmm.
5  Q  A lady by the name Edyta, and I'll spell
6  that, E-D-Y-T-A, last name Rogalsko, R-O-G-A-L-S-K-O,
7  are you familiar with that individual?
8  A  No, I don't know that one.
9  Q  Okay. She's, I guess, an employee claiming
10  that she's owed $3,321?
11  A  Mm-hmm.
12  Q  You have no information about that?
13  A  No.
14  Q  Now, you had indicated previously that there
15  are a number of employees?
16  A  Most of the employees are missing at least a
17  month's worth of wages.
18  Q  First of all, how many employees are employed
19  by BSML, Inc.?
20  A  BSML, Inc. has about 80 employees. BSML,
21  Inc. also, at the same time, because of our corporate
22  structure, there are other professional corporations
23  that we have a management agreement with to pay all
24  their employees. Those payments would go through the
25  professional corporations, because in most states what

Page 25

1  we do requires a dentist to do the procedures.
2    Q  Okay.
3    A  So we have a professional corporation that
4  has a dentist that is allowed to perform the
5  procedures.
6    Q  Just so I can understand this set up a little
7  bit better, is there a similar set up like that
8  locally in Broward or Palm Beach County?
9    A  No, because we don't operate in this state
10 any longer.
11   Q  Oh, is that right?
12   A  Yeah, we have no retail operations.
13   Q  How about in the State of Georgia, are you
14 required to have --
15   A  Yes.
16   Q  -- that?
17      So are you saying to administer Brite Smile
18 services, it has to be done in conjunction with a
19 dentist?
20   A  Yes. It has to be a licensed dentist.
21   Q  And, therefore, what is the business
22 arrangement with, let's stick with the State of
23 Georgia -- because I'm trying to find out if the
24 people who are claiming to be employees are actually
25 employees of those physicians -- or those dentists or

Page 26

1  of Brite Smile.
2    A  No. I think these employees are probably
3  from the call center, which was a part of Brite Smile.
4    Q  All right. Let me go through the rest of the
5  names and see if --
6    A  Mm-hmm.
7    Q  Are you familiar with the 80 employees that
8  you indicated are employed --
9    A  Yes.
10   Q  -- by Brite Smile?
11   A  Yes.
12   Q  The call center is a different company?
13   A  No. The call center was just a group in
14 Atlanta --
15   Q  Okay.
16   A  -- because they had a computer system that
17 could handle the incoming calls. They would take all
18 the incoming calls on the 800 lines, be able to make
19 appointments for customers, sell them services, make
20 an appointment --
21   Q  Are those individuals --
22   A  -- take payments.
23   Q  -- employees of Brite Smile?
24   A  Yes.
25   Q  Okay. Let me go through the rest of the list

Page 27

1  then and see if any of the names ring a bell.
2       Her Kollinger?
3    A  That's Dr. Kollinger, and he was chief
4  medical officer for Pure, and I think he was the
5  medical officer for the Atlanta operation.
6    Q  Was he an employee of BSML?
7    A  I'm not sure who he was employed by.
8    Q  Okay. Dr. Kollinger claims that he's owed
9  wages of $4,000.
10      Do you dispute that?
11   A  No. In fact, that sounds low for --
12   Q  Okay. This one is going to be tough Ananita
13 (phonetic) --
14   A  Anahita.
15   Q  Ghalander?
16   A  Yes, I know Ana.
17      MR. FERRARA: I'll spell these for you later.
18 BY MR. FERRARA:
19   Q  Is she --
20   A  She was in charge of the call center.
21   Q  Clearly an employee of BSML?
22   A  Yes.
23   Q  She claims that she's owed approximately
24 $3,125.
25      Is that an amount that you agree with or

Page 28

1  dispute?
2    A  Again, I think it's low, but that's
3  probably --
4       MR. SHRAIBERG: I just want to clarify
5  something.
6       Do you agree that the alleged debtor owes
7  Mr. Kollinger $4,000?
8       THE WITNESS: Yes.
9       MR. SHRAIBERG: Do you -- did I say "Did you
10 dispute?" I might have said that backwards.
11      Do you agree that the alleged debtor --
12      THE WITNESS: Yes.
13      MR. SHRAIBERG: -- owes $4,000?
14      THE WITNESS: Yes.
15      MR. SHRAIBERG: Do you believe that the
16 alleged debtor owes Ms. Ghalander at least 3,100 --
17      THE WITNESS: Yes.
18      MR. SHRAIBERG: -- 25 dollars?
19      THE WITNESS: Yes.
20 BY MR. FERRARA:
21   Q  How about an individual by the name of Katie
22 Rose?
23   A  I'm not familiar with that name.
24   Q  Are you familiar with a company called ASC
25 Group?

Page 29

1  A  Yes. That's Alan. That's the company that
2  provided computer services for us in Atlanta.
3  Q  And they claim that they are owed
4  approximately $10,536.
5  A  Yes.
6  Q  Do you agree that that's an amount that they
7  are owed?
8  A  I think -- it sounds a little high by Alan,
9  but yes, we have invoices for those.
10  Q  A woman by the name of Nita Kalinski, are you
11  familiar with that name?
12  A  No, I'm not.
13  Q  How about Merline Sainvil?
14  A  No, I'm not.
15  Q  Not familiar.
16     All right. Karen Norris?
17  A  Karen Norris was like the assistant manager.
18  Q  For the call center?
19  A  Well, of the Atlanta operation.
20  Q  All right. Ms. Norris claims that she's owed
21  wages, unpaid wages of $10,351.
22     Do you agree with that amount or dispute
23  that?
24  A  That one sounds a little high, but it's --
25  she may -- she may have been out as much as two

Page 30

1  months.
2  Q  Do you agree that she's owed some funds --
3  A  Yes, yes.
4  Q  -- from Brite Smile?
5  A  Yeah, she's owed well over $5,000 at least.
6  Q  And then you indicated before about
7  Mr. Kenneth Gary, that there's a note that's owed to
8  him --
9  A  Yes.
10  Q  -- for approximately half a million dollars?
11     Is he also an employee?
12  A  Yes.
13  Q  Mr. Gary claims he's owed unpaid wages of
14  approximately $9,600?
15  A  Yes.
16     MR. FERRARA: These are a list of all the
17  creditors as of June.
18     MR. SHRAIBERG: Okay.
19  BY MR. FERRARA:
20  Q  Do you agree that --
21  A  Yes.
22  Q  -- Mr. Gary is owed at least that amount?
23  A  Yes.
24  Q  You do not dispute that amount?
25  A  No.

Page 31

1     MR. SHRAIBERG: Did you introduce this yet?
2     MR. FERRARA: Yeah, it's No. 2. It's as of
3  June 2009. We can go off the record for a second.
4     (Discussion off the record.)
5     MR. SHRAIBERG: We can go back on.
6     I don't know if Mr. Ferrara asked this
7  already, does the company generally pay its debts as
8  they come due?
9     THE WITNESS: In the last year, Brite Smiles
10  has always been cash strapped. We try to pay
11  something, you know -- some of them -- well, some
12  debts have been there for quite a while.
13     MR. SHRAIBERG: Are you in what I would
14  classify a robbing-Peter-to-pay-Paul mode?
15     THE WITNESS: Yeah.
16     MR. SHRAIBERG: Do you -- when it's time to
17  pay bills, do you find yourself classifying which
18  vendors are critical versus which ones we can do
19  without when deciding who to pay?
20     THE WITNESS: Yes.
21     MR. SHRAIBERG: Are there certain payables
22  that you just ignore for cash flow reason?
23     THE WITNESS: Yeah, a lot. Some of the
24  smaller ones always got ignored, because -- on this
25  one, the aging piece is cut off, but you can see a lot

Page 32

1  of the aging is very very old.
2  BY MR. FERRARA:
3  Q  Mr. Norris, you indicated, was the CEO of the
4  company, correct?
5  A  Yes.
6  Q  Are you familiar with any instances where
7  corporate assets are presently being depleted?
8  A  Yes.
9  Q  Okay. Can you tell me what knowledge you
10  have?
11  A  One is the accounts receivable with Group On.
12  Q  Okay. Group, G-R-O-U-P-O-N?
13  A  Right.
14  Q  Two words, one word?
15  A  Two words.
16  Q  Okay. The accounts receivable with Group On,
17  go ahead.
18  A  Is approximately $350,000.
19  Q  Right.
20  A  We had called Group On asking where that
21  receivable is, and they told us it had been paid
22  already, and they actually forwarded us a copy of the
23  wire transfer.
24  Q  And where did the transfer go?
25  A  The wire transfer went to BSML of Canada,

8 (Pages 29 to 32)

Page 33

1  which is personally owned by Mr. Nourse.
2     Q  Did you talk to Mr. Nourse -- first of all,
3  what was the amount of the wire transfer?
4     A  Three-hundred sixty-five thousand dollars.
5     Q  Did you discuss what you found with Mr.
6  Nourse?
7     A  Well, we just recently found this out.
8     Q  Okay.
9     A  Mr. Nourse at that point, turned around,
10 within a few days of receiving that, and advanced back
11 to Brite Smile $300,000, and, of course, he wanted us
12 to draw him up a notes payable for the $300,000 that
13 he advanced us.
14    Q  Even though it was already --
15    A  It was really my money, but --
16    Q  Right.
17    A  Excuse me when I call it "my" money.
18    Q  I understand, but BSML's money, not BSML of
19 Canada's money?
20    A  Right.
21    Q  And, of course, there's $65,000 that's
22 unaccounted for --
23    A  Unaccounted for.
24    Q  -- even in that scheme?
25    A  Yes.

Page 34

1     Q  Are there any other scenarios or situations
2  in which you think that BSML, Inc.'s assets are being
3  depleted?
4     A  In the original transaction, okay, when I
5  came in, I was told that he personally bought the
6  Canadian assets from Pure.
7     Q  Mm-hmm.
8     A  The company had advanced him $75,000 for that
9  purchase.
10    Q  BSML advanced Mr. Nourse $75,000, so he could
11 then purchase BSML of Canada's present assets?
12    A  Yes.
13    Q  Got it.
14    A  We charged that to his wage expense, because
15 he earns 350,000, and we don't really cut him wage
16 checks, so we charged that to --
17    Q  Okay.
18    A  But no documents were ever produced.
19    Q  Demonstrating that he --
20    A  I just needed the documents, because -- you
21 know, because of Enron, the accounting profession,
22 where you have senior management owning companies or
23 buying things at the same time the company is buying
24 the rest, you need to have full disclosure.  He's
25 never released any of those documents.

Page 35

1     Q  Okay.
2     A  Okay, but I've received copies of those
3  documents.
4     Q  Through another source?
5     A  Through another source.
6        And, first of all, those document showed that
7  BSML, Inc. purchased Canada, not Jeff Nourse,
8  individual.
9     Q  So when you say that he personally owns BSML,
10 Inc. --
11    A  Of Canada.
12    Q  -- technically -- of Canada, technically
13 BSML, Inc. should be --
14    A  Should be the owner.  He could have very
15 easily have assigned it to himself, you know,
16 somewhere, but what I find interesting is in the
17 original document, it shows that he would assume
18 $516,000 worth of debt that Pure, the company he
19 bought it from, had with BDC, which is the Business
20 Development Corporation of Canada, so it showed for
21 75,000 and assumption $516,000 in debt, he purchased
22 the Canadian operations.
23    Q  Okay.
24    A  Okay.  On 4/1/09, we closed with Medisis and
25 purchased the remaining portion -- BSML closed with

Page 36

1  Pure buying another 20 stores.
2        At that closing we paid BDC $516,000 worth
3  of -- to pay the debt off, and, you know, that had
4  been negotiated as all part of the rest of the deal,
5  and from what I can surmise, that was the Canadian
6  portion of the debt, so, therefore, he paid off his
7  debt and left the liabilities on the U.S. corp.
8     Q  I've heard an allegation that Mr. Nourse is
9  selling units of the company.
10       Do you have any knowledge of that?
11    A  Right now there's another company called
12 Ultimate Dental that he was looking to raise capital
13 with, and they are currently operating ten to 12 of my
14 operations.
15    Q  Where are those located?
16    A  Those are located throughout the U.S.  I know
17 there's one in Virginia, two in the Chicago area, and
18 I believe five in the Washington/Oregon area.
19    Q  Are they franchisees?
20    A  They are our old stores.  They are our old
21 operations, and they are currently staffed by our old
22 employees.  I'm sure they are servicing our old
23 customers.
24    Q  Okay.
25    A  And none of the proceeds are coming through

9 (Pages 33 to 36)

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

Page 37

1    any of my bank accounts.
2        Q  So we have a company -- well, we have a
3    number of locations in the eastern United States,
4    that's basically providing the same services as BSML,
5    with same BSML products and BSML employees, but none
6    of the revenues --
7        A  Yes.
8        Q  -- are being sent to BSML, Inc.?
9        A  None.
10       Q  Do you have an understanding as to what
11   Mr. Nourse's relationship is with those -- I will call
12   them those outlets -- those stores?
13       A  No, I don't know.  What I believe is that I
14   believe they are going to enter into some kind of
15   agreement sometime in the future where he will be a
16   part of that new operation.  I mean, it's my feeling
17   that he's using the license of the company, the
18   current operations, for his capital contribution into
19   a new company, and his two other partners are putting
20   in cash --
21       Q  Who are --
22       A  -- for the operations.
23       Q  Who are the other two partners that he's
24   involved with there?
25       A  The two people that run Ultimate Dental in

Page 38

1    Canada.
2        Q  Okay.  So in addition to the lack of revenues
3    coming from those old stores, has BSML received any
4    funds from Ultimate Dental to take over the operation
5    of those stores?
6        A  None whatsoever.  In fact, I've asked.  I
7    said I need some to do some operations and cleanup and
8    maybe even pay some of the employees.
9        Q  And what was the response?
10       A  It's like, "Well, Sven is not going to put
11   any money into that company.  It will just get eaten
12   up, and it would be like throwing it away."
13       Q  You said Sven?
14       A  Sven is one of the partners from Ultimate
15   Dental.  I don't remember Sven's last name.
16       Q  Okay do you know the name of the other
17   partner?
18       A  No.  They are the principals of Ultimate
19   Dental.
20       Q  Have you spoken to Ms. Talbot about this
21   scenario or what is going on?
22       A  I have not heard from Louise in three weeks,
23   or probably -- no, I'm sorry, probably six weeks now.
24       Q  I know you're accounting software is shut
25   down.

Page 39

1        A  Mm-hmm.
2        Q  I tried before today's examination to get
3    onto the web site.
4            That doesn't seem like it's up and running,
5    is it?
6        A  The web site was up and running.  I don't
7    know if it's down, but it very recently went down.
8        Q  All right.  Are there other vendors out there
9    that are now unpaid and cut off vital services to you
10   as the administrator of Brite Smile?
11       A  Most of -- most of the ones that can cut off
12   services have already.
13       Q  Give me an idea of some of those vendors.
14       A  Well, the vendor that maintains my e-mail.
15       Q  What is the name of that vendor?
16       A  That is I-net (phonetic) Portals.  They also
17   do the POS system.  I don't have access to my old
18   e-mails, which most of these documents I could have
19   produced within seconds if I had my e-mails --
20       Q  Sure.
21       A  -- and -- well, he does the POS system.
22           A lot of the landlords are foreclosing and
23   closing the doors on us now.  They are due three or
24   four months' worth of rent.
25       Q  Are any of the locations involved in eviction

Page 40

1    actions?
2        A  I'm sure there's several at this point.
3        Q  How about telephone service?
4        A  Telephone services, for the most part, is all
5    starting to drop off now too.  Electric -- it's just
6    cascading through the country, and what's happened is
7    Ultimate had come down to our offices and done some
8    due diligence on the operations, and that's how they
9    picked these ten or 12 stores, because they know these
10   are profitable operations.
11       Q  Who are we speaking of there?
12       A  The people that are running it now, Ultimate.
13       Q  Ah, so they went and found out the most
14   lucrative locations and then sort of --
15       A  Right.  Now they are making sure that the
16   landlord does not foreclosure on those.  They are --
17       Q  Okay.  So they've --
18       A  -- making sure the power is on.  They've
19   cherry-picked our --
20       Q  I was about to use that exact same word.
21           They cherry-picked the best locations in the
22   Eastern United States and --
23       A  Well, throughout the United States.  They
24   picked the West Coast and --
25       Q  And how many of those are there altogether?

Page 41

1  A  I believe there ten or 12.  I mean, I
2  don't -- I've asked Jeff several times.  It's like,
3  how many are they operating?  Because he would like me
4  to give them a list of the assets, so they can say
5  that they will pay for them, or they will safeguard
6  them for us, and it's like, "Well, you have to tell me
7  where they are."
8  Q  Okay.  All right.
9    MR. FERRARA:  Let me take a quick break, and
10  I think we should be done.
11    (Thereupon, a brief recess was taken.)
12  BY MR. FERRARA:
13  Q  I just want to do sort of a percentage.
14    What's the total number of locations that
15  Brite Smile was running in the United States and
16  Canada?
17  A  The U.S. was 39.  Canada I believe was five.
18  Q  And now, to the best of your knowledge, how
19  many are being run with some assistance of Ultimate
20  Dental?
21  A  Ten to 12.
22  Q  And the monies, the revenues, that are coming
23  from those ten to 12 locations is not making into BSML
24  bank accounts?
25  A  They are not coming anywhere to BSML, no.

Page 42

1    MR. FERRARA:  Okay.  That's about it.
2    Anything from you?
3    MR. SHRAIBERG:  No, I want to thank you for
4  coming.  If we cannot resolve this issue, and looks
5  like it's more likely than not that it won't, we may
6  be seeking an emergency trustee and would ask if you
7  will make yourself available for that hearing if
8  possible.
9    THE WITNESS:  Mm-hmm.
10    MR. SHRAIBERG:  Thank you.
11    (Discussion off the record.)
12    THE WITNESS:  No, I'll waive.
13    (Whereupon, the deposition was concluded.)

Page 43

1        Certificate
2  STATE OF FLORIDA:
   COUNTY OF PALM BEACH:
3
4    I, Anna M. Meagher, Shorthand Reporter and
5  Notary Public for the State of Florida at Large, do
6  hereby certify that the foregoing 2004 Examination of
7  JAMES CULLIN was taken before me, in the cause, at the
8  time and place, and in the presence of counsel as
9  stated in the caption hereto; that the said witness
10  was first duly sworn by me; and that the foregoing
11  pages, numbered 1 through 43, inclusive, constitute a
12  true record thereof.
13    I further certify that I am not of counsel, I
14  am not related to nor employed by any attorney in this
15  case.
16    Dated this 19th day of April 2010.
17
18    _____
19  My Commission Expires:   Anna M. Meagher,
    January 8, 2013         Notary Public
20  Commission #DD850415    State of Florida at Large